# NILSON ET AL. *v.* STATE OF MARYLAND

[No. 278, September Term, 1973.]

*Decided July 5, 1974.*

180

*Motion for rehearing filed August 2, 1974; denied September 9, 1974.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Ronald L. Spahn, Assigned Public Defender,* for appellants.

*James L. Bundy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

Appellants Nilson, McCoy, Campbell, Watford and Johnson were found guilty of armed robbery and related offenses by a jury at a joint trial in the Criminal Court of Baltimore. The convictions of each appellant, except Watford, were affirmed on appeal by the Court of Special Appeals in an unreported per curiam decision (*Nilson, et al. v. State,* No. 138, Sept. Term, 1973).[1] We granted certiorari limited to the question whether the trial court erred in failing to suppress incriminating evidence seized by the police following the warrantless arrests of the appellants inside an apartment occupied by them.

As shown by the evidence developed on the merits of the appellants' motion to suppress, on February 23, 1972, at approximately 9:40 a.m., the Belmar Building and Loan

---

1. Watford's conviction for conspiracy to rob was affirmed on appeal; his other convictions were reversed.

Association was held up at gunpoint by three negro males wearing ski masks; they fled in a 1967 gray Pontiac bearing Connecticut license tag GW-9762, taking approximately $3,000, including $200 in marked or "bait" money. The robbers were described by the Association's assistant manager as being thin, one approximately 6'2" in height and the other two approximately 5'9" tall, armed with a shotgun, a carbine rifle, and a revolver. Another employee described one of the robbers as "rather heavy set," approximately 5'11" tall, armed with a shotgun; another as taller and thinner, approximately 6' tall, armed with a "pump type" rifle; and the third as approximately 5'7" tall, armed with a revolver and carrying a "little zipper bag."

A report of the armed robbery, containing a description of the robbers and the Pontiac in which they fled, was promptly broadcast over the police radio. Shortly after 10:00 a.m. the police were notified by Anna Orndorff that, earlier that morning, she had observed a negro man park a 1971 green Ford Torino on Raspe Avenue, a few blocks from the Association's office, and drive off in a small white foreign car bearing Pennsylvania license tags occupied by two other negro males; that twenty minutes later, she observed a gray Pontiac, Connecticut license tag GW-9762, moving at a fast rate of speed, turn on to Raspe Avenue; that the same three negro males got out of the Pontiac and drove off in the Torino; that her son William followed the Torino in his car for a short distance and observed the occupants park the Torino and board a bus, after which two of the men got off the bus and entered Yellow Cab No. 558. Immediate police investigation revealed that the two negro males had been discharged from the cab at Callow Avenue and Whitelock Street.

Shortly before 11:00 a.m. the police located the abandoned Pontiac which the robbers had driven from the scene of the crime. It was ascertained that the vehicle had been stolen from its owner on the evening of February 22. The Pontiac was then searched and a one-hour dry cleaning ticket was discovered under the front passenger seat in the name of "McCoy" with an address listed as "2458 Callow." This

information was immediately broadcast over police and FBI radio and approximately fifteen Baltimore City police officers and thirty FBI agents promptly responded to the three-story, fifteen unit, multiple dwelling apartment house at that address. A white Peugeot with Pennsylvania license tags was observed by the police parked in the immediate vicinity of the apartment building.

Police investigation conducted inside the apartment building, according to the testimony of Sergeant Joseph Lovitt, Jr., "revealed that there were three persons living on the third floor who had a foreign made car that had Pennsylvania license tags . . . ." Sergeant John Conroy spoke with Joseph Adams, who resided in apartment 10, and was told that several men were living on the third floor in apartment 12; that three men left that apartment at approximately 8:00 a.m. that morning, carrying a "checkerboard" bag and drove off in a white automobile with Pennsylvania tags "that they always use" ; that the same three men returned to that apartment between 11:00 and 11:30 a.m.; and that shortly thereafter, a fourth man went into the apartment. Officer Conroy promptly relayed this information to Sergeant George Shriner, the supervisor of the investigation. Shriner's investigation had revealed that apartment 12 was rented by Frank Watford and that the apartment was frequented by other men at various times. At approximately 12:45 p.m., Shriner with other officers proceeded to apartment 12 to "effect the arrest of McCoy if he was on the premises or any other person that fit the descriptions of the wanted subjects in . . . [the] robbery." Shriner knocked on the door. Appellant Monroe Campbell, Jr., a 6′ negro male weighing approximately 160 lbs., answered the door, but refused to admit Shriner, who identified himself as a police officer and stated his purpose, unless he had a search warrant. Shriner observed two other negro males in the apartment and, upon hearing noise coming from the back room, he "pushed the door open" and placed Campbell under arrest. Appellant Nilson was arrested in the front of the apartment. Sergeant Lovitt went to the rear of the apartment and arrested appellants

Watford, Johnson and McCoy in the "middle" bedroom, "[d]ue to them fitting the general description as to the other two persons seen at the bank, 5'9", 150 pounds — ... 5'6", 130 pounds." A carbine rifle, observed in an open cupboard four feet from the three men, was seized and a search of Johnson's person produced $53 in currency, including $40 in "bait" money. Lovitt also seized a shotgun sticking out of a plaid clothing bag in the closet of the rear bedroom, visible to him from the middle bedroom. Two ski masks and a loaded revolver were found under a mattress in the rear bedroom, and a boot containing $970 in $10 bills was discovered in a cupboard in the middle bedroom; these items were also seized by the police. No arrest or search warrants had been obtained.

In support of their motion to suppress the evidence seized from the apartment, the appellants contended that Sergeant Shriner's warrantless entry into apartment 12 and Campbell's warrantless arrest were illegal because there was no probable cause to believe Campbell was one of the robbers; that the seizure of evidence as an incident to that illegal entry and arrest was also illegal; and that, even assuming that the police had probable cause to arrest Campbell, their right to search extended only to his person, and the area within his immediate reach, and did not include the right to search the middle and rear bedrooms where the appellants McCoy, Watford, and Johnson were arrested and the incriminating evidence was seized.

The trial judge concluded from the evidence that the police team investigating the robbery had probable cause to believe that a felony had been committed and that the persons who committed it were in apartment 12; that Campbell fit the description of one of the robbers and that his warrantless arrest inside the apartment was valid; that the police had probable cause to believe that the other two robbers were also on the premises, together with their weapons and money taken during the robbery; that exigent circumstances existed justifying the police to look for the other robbers in the apartment and that their subsequent arrests without warrants were lawful; that it was therefore lawful to search

Johnson's person incident to his arrest, and to seize the guns in plain view in close proximity to the arrested men. The trial judge granted the motion to suppress as to the ski masks and revolver found under the mattress, and the boot containing $970 found in the closet; he ruled that seizure of these items was invalid in the absence of a search warrant.

As a general rule, whether an arrest for a felony without a warrant is constitutionally valid necessarily turns upon whether, at the moment the arrest was made, the arresting officer or the police acting as a team had probable cause to make it — whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the accused had committed or was committing a felony. *McCray v. Illinois*, 386 U. S. 300, 87 S. Ct. 1056, 18 L. Ed. 2d 62 (1967); *Farrow v. State*, 233 Md. 526, 197 A. 2d 434 (1964); *Mullaney v. State*, 5 Md. App. 248, 246 A. 2d 291 (1968). The rule of probable cause is a nontechnical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction, but more evidence than that which would arouse a mere suspicion. *Mobley and King v. State*, 270 Md. 76, 310 A. 2d 803 (1973); *Gilmore v. State*, 263 Md. 268, 283 A. 2d 371 (1970). On the record in this case, we agree with the conclusion reached by the trial judge and the Court of Special Appeals — that at the time the police entered apartment 12, they had probable cause to believe that the robbery had been committed by persons then located on the premises. Indeed, as the evidence so dramatically reveals, within minutes after the crime was committed, the police were closely monitoring the movements of the suspected felons and the information which they received led unmistakably to the apartment house at Callow Avenue, and particularly to apartment 12. The police had general descriptions of the three robbers. They knew that at least three men were then in apartment 12 — the same three that earlier that morning had driven off in the white Peugeot, a vehicle previously identified as having been used by the robbers. That one of the robbers was named McCoy was

deemed likely because a ticket bearing his name and his Callow Avenue address was found in the stolen Pontiac which was used as the getaway car. Sergeant Shriner's observation upon requesting entry to apartment 12 that Campbell fit the general description of one of the robbers added materially to the probable cause then possessed by the police.

Appellants urge that even if probable cause existed for the police to believe that they had committed a felony, and were inside apartment 12, the forced entry by the officers into the premises without either a search or arrest warrants vitiated the subsequent arrests and searches. It is true, of course, that as a general rule an entry made in violation of constitutional standards will ordinarily nullify the legality of such arrests and accompanying searches. *Ker v. California,* 374 U. S. 23, 83 S. Ct. 1623, 10 L. Ed. 2d 726 (1963); *Gouled v. United States,* 255 U. S. 298, 41 S. Ct. 261, 65 L. Ed. 647 (1921). At common law it was recognized that a peace officer lawfully seeking to arrest an individual in a dwelling, either by authority of an arrest warrant or under circumstances making a warrant unnecessary, must give proper notice of his purpose and authority and be denied admittance, before he could use force to break and enter to effectuate the arrest. *See Henson v. Maryland,* 236 Md. 518, 204 A. 2d 516 (1964); *Berigan v. State,* 2 Md. App. 666, 236 A. 2d 743 (1968); Kauffman, *Law of Arrest in Maryland,* 5 Md. L. Rev. 125 (1940-41); 5 Am. Jur. 2d *Arrest* §§ 86-93; *Miller v. United States,* 357 U. S. 301, 78 S. Ct. 1190, 2 L. Ed. 2d 1332 (1958); *Accarino v. United States,* 179 F. 2d 456 (D.C. Cir. 1949); *United States v. Monticallos,* 349 F. 2d 80 (2nd Cir. 1965); *Dickey v. United States,* 332 F. 2d 773 (9th Cir. 1964). *See also Lankford v. Gelston,* 364 F. 2d 197 (4th Cir. 1966). In *Ker v. California, supra,* the Supreme Court held on the particular facts there present that there was no Fourth Amendment violation in a forced entry into a dwelling made by the police without either a search or arrest warrant on probable cause to believe that the occupants had committed a felony and evidence pertaining thereto was located within the dwelling. In *Coolidge v. New Hampshire,* 403 U. S. 443,

91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971), a majority of the
Court, in dicta, stated that "the notion that the warrantless
entry of a man's house in order to arrest him on probable
cause is *per se* legitimate is in fundamental conflict with the
basic principle of Fourth Amendment law that searches and
seizures inside a man's house without warrant are *per se*
unreasonable in the absence of some one of a number of well
defined 'exigent circumstances.'" 91 S. Ct. at 2044. In
*Warden v. Hayden*, 387 U. S. 294, 87 S. Ct. 1642, 18 L. Ed. 2d
782 (1967), the Court considered the validity of an entry by
police officers into a dwelling to effect a warrantless arrest.
There, the police were informed that the accused had
entered the dwelling after committing an armed robbery
and they responded to the scene within minutes of the
commission of the crime. The officers entered and searched
the three-room dwelling, arresting the accused and seizing
evidence subsequently admitted against him at trial. In
upholding the validity of the entry and the admissibility of
the evidence, the Court stated at 298-99:

> "We agree with the Court of Appeals that neither
> the entry without warrant to search for the robber,
> nor the search for him without warrant was
> invalid. Under the circumstances of this case, 'the
> exigencies of the situation made that course
> imperative.' *McDonald v. United States*, 335 U. S.
> 451, 456, 93 L. Ed. 153, 158, 69 S. Ct. 191. The police
> were informed that an armed robbery had taken
> place, and that the suspect had entered 2111 Cocoa
> Lane less than five minutes before they reached it.
> They acted reasonably when they entered the house
> and began to search for a man of the description
> they had been given and for weapons which he had
> used in the robbery or might use against them. The
> Fourth Amendment does not require police officers
> to delay in the course of an investigation if to do so
> would gravely endanger their lives or the lives of
> others. Speed here was essential, and only a
> thorough search of the house for persons and
> weapons could have insured that Hayden was the

only man present and that the police had control of all weapons which could be used against them or to effect an escape."

In *Dorman v. United States*, 435 F. 2d 385 (D.C. Cir. 1970), involving the armed robbery of a clothing store, the police had probable cause to arrest the appellant for the offense, but were unable to locate a magistrate at night to issue an arrest warrant; they went to the appellant's home to arrest him without a warrant and were told by appellant's mother that he was not at home. On hearing noise coming from a rear bedroom, the officers entered the house and began searching for the appellant. In the course of looking for him, the officers seized clothing in a closet which had been taken in the robbery. In rejecting the appellant's contention that this evidence should have been suppressed, the court addressed itself to the question of the validity of the entry to make the warrantless arrest. It said:

"The issue is whether the police acted unreasonably, and in violation of constitutional rights, when they proceeded, in furtherance of their objective to arrest a suspect they had probable cause to believe was an armed felon, to make a warrantless, unconsented, non-forcible entry into his home late in the evening, at a time some few hours after the offense and within an hour after they obtained eyewitness identification of the suspect, and when a magistrate was not readily available."

\* \* \*

". . . In general a home may not be searched without a warrant notwithstanding probable cause."

\* \* \*

"We now come to the question whether the general requirement of a warrant as a condition for entry into a house is subject to an exception where the entry is for the purpose of making an arrest of a

suspected felon. As we shall later point out, the requirement of a warrant may be excused where circumstances do not tolerate delay, like that incident to obtaining a warrant, of an officer making an arrest. But the basic principle, the constitutional safeguard that, with room for exceptions, assures citizens the privacy and security of their homes unless a judicial officer determines that it must be overridden, is applicable not only in case of entry to search for property, but also in case of entry in order to arrest a suspect. . . ."

435 F. 2d at 338-390.

The court then enumerated considerations material to assessing the existence of exigent circumstances, as follows:

"First, that a grave offense is involved, particularly one that is a crime of violence. *See, e.g., Warden v. Hayden, supra; McDonald v. United States*, 335 U.S. 451, 459, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (concurring opinion of Justice Jackson). Contrariwise the restrictive requirement for a warrant is more likely to be retained, and the need for proceeding without a warrant found lacking, when the offense is what has been sometimes referred to as one of the 'complacent' crimes, like gambling.

"Second, and obviously inter-related, that the suspect is reasonably believed to be armed. Delay in arrest of an armed felon may well increase danger to the community meanwhile, or to the officers at time of arrest. This consideration bears materially on the justification for a warrantless entry.

"Third, that there exists not merely the minimum of probable cause, that is requisite even when a warrant has been issued, but beyond that a clear showing of probable cause, including 'reasonably trustworthy information,' to believe that the suspect committed the crime involved.

"Fourth, strong reason to believe that the suspect is in the premises being entered.

"Fifth, a likelihood that the suspect will escape if not swiftly apprehended.

"Sixth, the circumstance that the entry, though not consented, is made peaceably. Forcible entry may in some instances be justified. But the fact that entry was not forcible aids in showing reasonableness of police attitude and conduct. The police, by identifying their mission, give the person an opportunity to surrender himself without a struggle and thus to avoid the invasion of privacy involved in entry into the home."

435 F. 2d at 392-93.

The court held that exigency sufficient to allow the warrantless entry was present and validated the seizure of the evidence, noting that appellant had been positively identified as one who had committed a crime of violence; that he had been armed; that the police had reasonable ground to believe that he would be in the dwelling; and that delay might permit escape as appellant had reason to believe that the police knew of his participation in the robbery. The court concluded:

"The search made upon peaceable entry was only to locate the person of the suspect, on suspicion that the noise heard was made by the suspect in hiding. If the entry to make an arrest was lawful, the police acted reasonably in looking behind sofas and in closets to locate the suspect. There was no rummaging of drawers, etc., to cloud the purpose of the police. Since we hold that the police acted reasonably and lawfully when they took the action without a warrant of entering the house and searching for Dorman in appropriate places, no valid objection can be made to their conduct, when in the course of the search in the closet for Dorman they saw the uncuffed trousers readily identifiable as coming from the store that had been robbed, in

seizing this clothing notwithstanding the absence of a warrant."
435 F. 2d at 394.

In *United States v. Harris*, 435 F. 2d 74 (D.C. Cir. 1970), involving an armed robbery committed by three men, police investigation revealed that the getaway car used in the robbery might belong to the appellant. They proceeded to his apartment, knocked on the door, and identified themselves as police officers. The officers then heard footsteps and considerable movement in the apartment and, after repeating their announcement, the door was opened by two men, one of whom fit the general description of one of the robbers. While standing at the open door, the officers saw large stacks of coins on the dining room table — probable loot from the robbery. The officers then entered and arrested the two men. The coins on the table were seized. Also seized were three pistols in a box in an open living room closet with the butt of one gun in view protruding from the box. One officer then proceeded to the bedroom, finding a large sum of money under a mattress. The appellant was subsequently arrested elsewhere. In upholding the entry and warrantless arrest and seizures, the court applied the rule announced in *Dorman*. It noted that the armed robbery was a crime of violence, in which a payroll carrier was actually wounded; that the police reasonably believed the robbers to be armed and therefore that a delay in their arrest would pose a danger to the community; that the police had sufficient probable cause to arrest the suspects only upon the opening of the apartment door, and that under such circumstances, the officers could not be expected to leave and obtain a warrant; that such a course of action would afford the suspects time to escape; that upon observing that the man who answered the door fit the general description of one of the robbers and upon seeing the coins on the dining room table, the police had strong probable cause to believe that the robbers were in the dwelling to be entered.

In the present case, contrary to appellants' contention, the primary mission of the officers in entering the apartment was to arrest the robbers; the arrests were not a mere

pretext to conduct a warrantless search of the premises for the fruits and instrumentalities of the crime. Assuming that exigent circumstances are constitutionally prerequisite to a forcible entry into a dwelling by police to make a warrantless arrest upon probable cause, we think that the evidence in this case, as heretofore related, plainly demonstrates the existence of such circumstances consistent with the principles outlined in the cited cases. That the police waited for well over an hour before attempting to enter the apartment does not compel the conclusion that the circumstances underlying their warrantless entry were not exigent. The record indicates that during much of this period the police were conducting an on-the-scene investigation at the apartment building, and were carefully assembling evidence of the probable involvement in the crime of the persons in apartment 12. Virtually all of the factors deemed important in *Dorman* and *Harris* to establish exigency are present in this case; and while the police pursuit of the appellants was not as "hot" as that in *Warden v. Hayden, supra,* it differs, in effect, in but minor degree. We conclude that the warrantless entry into apartment 12 was lawful; that the arrests of the appellants were based on probable cause and were likewise lawful; that the search of Johnson's person was lawful as incident to his arrest; that the seizure of the weapons in plain view in close proximity to at least three of the appellants was also lawfully incident to their arrest, as being within the area in which they might reach in order to grab a weapon, within the contemplation of *Chimel v. California,* 395 U. S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969). Nothing contained in *United States v. Gamble,* 473 F. 2d 1274 (7th Cir. 1973), upon which appellants rely, supports the proposition that *Chimel* interdicts a seizure of weapons incident to a valid arrest under circumstances like those present in the instant case.

*Judgments affirmed; costs to be paid by appellants.*