GARY LYNN ROBINSON *v.* STATE OF MARYLAND

[No. 219, September Term, 1980.]

*Decided February 4, 1981.*

The cause was argued before LOWE, MELVIN and LISS, JJ.

*Claudia Cortese, Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *Thomas J. Saunders, Assistant Public Defender,* on the brief, for appellant.

*Richard B. Rosenblatt, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Judith R. Catterton, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

MELVIN, J., delivered the opinion of the Court.

Pursuant to a jury trial conducted in the Circuit Court for Montgomery County, Gary Lynn Robinson, the appellant, was convicted of assault with intent to murder. Mr. Robinson has brought this appeal to contest the validity of that conviction. Appellant's primary complaint is that much of the evidence used to convict him was the fruit of an illegal search, and, therefore, the judge below erred in refusing to suppress the evidence so obtained. We find no merit in this or any of the other contentions made here by appellant; therefore, we shall affirm appellant's conviction.

Appellant's conviction arose out of a knifing which occurred on the night of May 24, 1979 at 8400 Greenwood Avenue in Takoma Park, Maryland. Eighty-Four Hundred Greenwood Avenue is a residential building comprised of five apartments and what might be referred to as a utility area. Four of the apartments are at the street level or above and are accessible through the front door of the building

which opens onto Greenwood Avenue; the fifth apartment and utility area share the basement level. The basement apartment is only accessible by an exterior stairwell located at the rear of the building. The utility area consists of two rooms (a laundry room and a boiler room) which are connected by an interior door. The sole entrance to the utility area is also at the foot of an exterior stairwell, and this entrance opens onto Wabash Avenue which is at the left side of the building as viewed from Greenwood Avenue. Although the basement apartment and the utility area are adjacent, there is no interior door connecting these two spaces. At the time of the incident, appellant resided in apartment number two at 8400 Greenwood Avenue and was employed as the maintenance man for the building. The basement apartment, number five, was rented to Mrs. Joyce Belcher, the victim.

At some point during the day of May 24, 1979, Mrs. Belcher, who lived alone, left her apartment. While she was out, one of the fuses in her apartment and at least one light bulb were unscrewed, so that the lights for the entire front half of her dwelling would not function. Consequently, when she returned home that night, Mrs. Belcher entered an extremely dark apartment which, despite her efforts, she could not illuminate. Before she could escape the darkness, a man who had been lurking within the apartment when she arrived, grabbed her, held a knife to her throat and threatened to kill her. A struggle ensued in which Mrs. Belcher received severe lacerations to her throat and face. Ultimately, the assailant fled, and Mrs. Belcher managed to make her way out of her apartment to the front of the building where her screams for help were heard by neighbors. Within minutes, both the police and a rescue squad arrived at the scene.

When the police arrived, they found Mrs. Belcher lying on the inside front steps of the apartment building; she was covered with blood and, though conscious, she was virtually incoherent. While Mrs. Belcher was being treated for her injuries and rushed to the hospital, the police began an extensive investigation of the scene. Some of the officers

searched and processed Mrs. Belcher's apartment. Others interviewed neighbors to learn what they might have seen or heard. Still others used police dogs in an attempt to track the assailant. During this investigation, a trail of blood was discovered which led from the front steps, where Mrs. Belcher was found, to the rear of the building. Blood was also found on the steps leading down to the victim's apartment and in the doorway. The door of the victim's apartment was found open and the bedroom window slightly raised; however, there were no signs of forced entry. Further investigation of Mrs. Belcher's apartment produced little evidence. Questioning of the neighbors was likewise unproductive. Owing to the large number of people present and the fact that it was raining heavily that night, the dogs were unable to pick up the assailant's trail. Thus, as of little more than an hour after the police had first arrived, neither the weapon nor the assailant had been found, and the police had no suspects.

Consequently, one of the officers present, Corporal Thomas Weidmann of the Montgomery County Police, decided to walk around the building to see if anything had been overlooked; in the process, it occurred to him to look for the culprit in the utility area which theretofore had not been investigated. There was no blood leading to the utility area or even on that side of the building, and, of course, the canine did not lead Officer Weidmann there. Rather, the policeman's attention was directed to the utility area by the plain fact that the assailant was still at large, and those darkened basement rooms offered a convenient and inviting place to hide.

Without attempting to obtain a warrant, Officer Weidmann sought the assistance of Corporal Robert German, and together they descended the exterior stairwell leading to the sole entrance to the utility area. According to appellant's testimony, this door, which opens into the laundry room segment of the utility area, bore a 3" x 5" handwritten sign which admonished users to "help keep the place clean and lock the door before leaving." Officers Weidmann and German both testified that they did not

notice any such sign. Appellant also testified that the laundry room was usually locked, so that access thereto was limited by key to the residents of the five apartment units in that building and one person in the building across the street. Appellant admitted that the door was unlocked when he entered the laundry room on the evening of May 24 and that the door had been unlocked on two of three prior trips he had made to the laundry room that day; however, he claimed that he had closed and locked the door behind him when he entered that evening. In sharp contrast, Officer Weidmann testified that the door had a padlock and hasp, suggesting that it could not be secured from the inside, and, moreover, that when he and Officer German approached the door, they found it unlocked and slightly ajar. Officer German clarified this testimony by estimating that there was a space between the door and the frame of approximately a quarter to one-half an inch. According to Officer Weidmann's testimony, he and Officer German opened the door the rest of the way, entered the laundry room and turned on the light. They found themselves in a large room containing a washer, dryer, ping pong table and some articles of personal property placed there for storage. Appellant testified that tools and other items belonging to him were stored there in the laundry room. Observing nothing of a suspicious nature in the laundry room, Officer Weidmann proceeded ahead into the adjoining boiler room; according to Weidmann, the door connecting the laundry and boiler room was also slightly ajar. Appellant testified that the door was closed.

In addition to a boiler, the boiler room houses a hot water heater, oil tanks and sinks. According to appellant, only he and the landlord were authorized to enter the boiler room; however, there was no lock on the door or other evidence indicating that access was so restricted. Appellant also claimed that he had slept in the boiler room on occasion and that he was sleeping there on the night of May 24, but both Officers Weidmann and German testified that the boiler room was extremely hot (90° or more), suggesting that it was not fit for sleeping. Further, appellant admitted that he had never eaten in the boiler room, that he did not store any personal property there, and that it was not his office.

After Officer Weidmann entered the boiler room and turned on the light, he observed in plain view a knife, a sheath, a jacket, a hat and gloves. The knife had blood on it, and the sheath contained the name "Gary Lynn Robinson" written in blue ink; the name was legible to Officer Weidmann without his moving the sheath. The articles just described were noticeably free of dust unlike the fixtures in the room. At some point, Officer German joined Officer Weidmann in the boiler room and shortly thereafter spied appellant's body protruding from under some foam rubber carpet padding, where appellant appeared to be hiding. Officer German ordered appellant to stand up; he complied, and German observed blood on his trousers and arm. Following a brief inquiry by the officers, appellant was placed under arrest. Subsequently, the articles of clothing and the weapon discovered in the boiler room were seized.

## Search and Seizure

Appellant now contends, as he did below, that by entering the boiler room and seizing the articles found therein, the police violated his Fourth Amendment rights. Accordingly, he asserts that the articles so obtained should have been suppressed. At the conclusion of a two-day suppression hearing, Judge Frosh decided to deny the motion to suppress because he found: 1) appellant had no reasonable expectation of privacy in the boiler room; and 2) there were exigent circumstances justifying the search complained of. We would note at the outset that each of these two findings is an independently sufficient basis for having denied appellant's motion. Hence, in affirming Judge Frosh's ruling, we shall ground our decision upon the finding that is, in our opinion, the most clear in view of the facts adduced at the suppression hearing: the entry into the boiler room — though warrantless — was, nevertheless, reasonable given the exigent circumstances then existing. In so grounding our decision, we assume — without deciding — that appellant had a legitimate expectation of privacy in the boiler room such that the disputed search and seizure, had it been unreasonable, would have infringed an interest of the appel-

lant which the Fourth Amendment was designed to protect. *See generally Rakas v. Illinois,* 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978).

The Fourth Amendment does not prohibit all searches and seizures, nor does it absolutely prohibit every search and seizure that is warrantless; on the contrary, the Fourth Amendment proscribes only those governmental intrusions into our spheres of privacy which are deemed "unreasonable." In that connection, it has long been the rule that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). Nevertheless, over the years, the courts have willingly, but with the appropriate measure of judicial caution, established and broadened exceptions to the warrant requirement where to do otherwise would have elevated our right to freedom from governmental intrusion above values which we cherish even more dearly. One such exception, born of this very reasoning, is the "emergency doctrine."

The emergency doctrine exception to the warrant requirement has been recognized by the Supreme Court on a number of occasions. Notably, the Court in *Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294, 298-299, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967) stated that, "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." Recently, in *Mincey v. Arizona,* 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978), the Court found the emergency doctrine inapplicable but, nevertheless, reaffirmed its faith in the principle:

> "We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in

need of immediate aid. *Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." Id.* at 392 (emphasis added).

As this quotation suggests, while the Supreme Court has repeatedly recognized the emergency doctrine exception, the task of delineating the reach of this exception has been left for the most part to the state and lower federal courts.

A review of the decisions of those courts reveals that "emergency doctrine" is now a generic term that has come to be applied in a myriad of factual situations involving virtually every brand of exigent circumstance. *E.g., Lebedun v. State,* 283 Md. 257, 390 A.2d 64 (1978); *see* Mascolo, *The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment,* 22 Buffalo L. Rev. 419 (1972); Note, *The Emergency Doctrine, Civil Search and Seizure, and the Fourth Amendment,* 43 Fordham L. Rev. 571 (1975). Although on occasion, it has been applied to the protection of property, the essence of the emergency doctrine exception is the belief that the interest in preserving human life is paramount to the right of privacy secured by the Fourth Amendment. Note, 43 Fordham L. Rev. 571 *supra.* Accordingly, the justification for and ultimate purpose of an emergency doctrine search is the protection of human life. Typically, this means that a law enforcement officer's otherwise illegal intrusion will be legitimized by the fact that he is entering the premises to render aid to one whom he reasonably believes to be in urgent need; however, the purpose of the emergency doctrine is nonetheless accomplished and a warrantless governmental intrusion may be justified thereby, where the officer enters a premises in an effort to apprehend or locate a virulent criminal and, in that way, eliminate what he reasonably believes to be an imminent threat of continuing criminal activity. This latter variety of the emergency doctrine has been employed in a number of cases, at least three of which are particularly analogous to the case at bar.

In the case of *Fellows v. State,* 13 Md. App. 206, 283 A.2d

1 (1971), this Court was faced with an analogous situation. The Baltimore City Police had been summoned to the scene of a stabbing death which had just occurred in the second floor office of a multi-story building comprised of a restaurant on the first floor and apartments on the floors above the second story office.

> "Upon arrival [the police] were directed to the second floor landing. There they observed a large pool of blood outside the office door, with bloody footprints and a trail of blood leading up the stairs to the third and fourth floor apartments. Observing that the outside windows were closed and suspecting that [the] assailant was still in the building, they first went to the fourth floor apartment occupied by Mr. and Mrs. Haywood Simon. After knocking, the Simons, who were still in their bed clothes, came to the door but upon questioning they denied hearing any disturbance. The officers then returned to the third floor where the blood trail led to the third floor apartment, the door of which was partially open. After knocking, they entered the apartment and searched to see if anyone was hiding. The search revealed the apartment was empty but [Officer] Brauner observed a pair of bloodstained pants on a hanger in the closet." *Id.* at 209.

Appellant there argued that the warrantless entry and search of his third floor apartment was unlawful and that the trial judge, therefore, erred in denying his motion to suppress the State's evidence concerning the bloodstained pants. After thoughtful consideration we rejected appellant's arguments, concluding that the officers' search was reasonable under the exigent circumstances then existing: "The officers had good reason to believe that [the] assailant was still in the building, and they entered the apartment for the sole purpose of locating and apprehending him." *Id.* at 209-210.

In perhaps more explicit terms, the Supreme Court of Nevada applied the emergency doctrine to similar facts in

the leading case of *State v. Hardin,* 90 Nev. 10, 518 P.2d 151 (1974). The facts of that case were well summarized as follows:

"Summoned to investigate a homicide in Room 83 of the Mintz Hotel, where a violent struggle apparently had taken place, the police found a blood-drenched corpse, its throat cut and multiple stab wounds in its chest. Identification officers began collecting physical evidence, and thereafter, having no suspect, detectives commenced interviewing occupants of neighboring rooms, seeking information to throw light on the crime. Although respondent had earlier been seen entering Room 82, he did not respond to the officers' knock. For all they knew, he might have been asleep, drunk or merely attempting to avoid visitors. Believing it essential to interview respondent, whose room was closest to the death scene, and who therefore was most likely to have heard the final conflict, the officers opened his door with the manager's passkey.

The key to Room 83 lay on the floor in plain view. Wearing a blood-stained shirt, respondent was on the bed, staring up at the officers. When they ordered him to his feet, a knife later identified as the death weapon fell to the floor. Key and knife were blood stained." 518 P.2d at 152.

The court in *Hardin* upheld the warrantless entry of respondent's hotel room, opining that,

"These facts obviously provided the police grounds to believe there was urgent need to launch and pursue their investigation.

Clearly, after interviews with more distant neighbors of the victim proved unproductive, and after other methods of gaining respondent's attention proved unavailing, opening the door to seek an audience was both reasonably directed toward and confined to the officer's legitimate,

nonexploratory, emergency purpose. In our view, therefore, this conduct did not constitute an 'unreasonable search' in the constitutional dimension." *Id.* at 154.

Most recently, the New York Supreme Court had occasion to apply the emergency doctrine to facts almost identical to those of *Hardin* and clearly analogous to the present case. As summarized by the New York court, those facts were as follows:

"Shortly after 7 P.M. on July 8, 1977, shots were heard coming from Room 643 at 611 West 112th Street, a single room occupancy hotel. Within minutes several police officers had responded to the scene, among them an Officer Sullivan. Sullivan entered Room 643, which was at one end of the hall, and observed within it the dead body of a woman who had been shot in the head at close range apparently shortly before his arrival.

Directly opposite the room was a communal kitchen which Sullivan entered. He then tried the door of an adjacent bathroom which was locked. Next to the bathroom was Room 645. Sullivan knocked on the door and no one responded. A hotel employee stated that the room was occupied by a man and a woman who had just been observed leaving the hotel, the man carrying a television set.

Sullivan directed the employee to unlock the door and with his gun drawn opened the door and stepped into the room. On top of a bureau of drawers he saw a pillowcase with red spots on it and something underneath the pillowcase which proved to be a woman's wallet. Another police officer removed the pillowcase and wallet to the Fifth Homicide Zone." *People v. Devine,* 66 A.D.2d 244, 414 N.Y.S.2d 128, 129 (1979).

In upholding the warrantless entry, the court stated:

"The emergency character of the situation confronting Officer Sullivan cannot seriously be

questioned. A woman had been shot to death within a few moments prior to his arrival at the scene. There was a strong likelihood that an armed murderer, and perhaps more than one, was on or near the premises. Nor could the possibility be excluded that the crime was linked to other crimes in the immediate vicinity not yet known to the police.

A prompt search of the immediate premises, including surely at the least nearby rooms, was critical. Such a search might disclose one or more killers, related crimes, or information that would permit prompt identification in time to make a speedy apprehension." *Id.* at 130.

In view of these cases it is plain to us that the warrantless entry of the boiler room in the present case was reasonable in the context of the exigent circumstances then existing and is, therefore, within the emergency doctrine exception to the warrant requirement. The police, here, were summoned to the scene of a savage throat slashing. Upon their arrival, they observed the blood-drenched victim on the front steps of the apartment building. They were able to obtain little information from her owing to the fact that she was virtually incoherent. The police followed a trail of blood to the victim's basement apartment, where they searched in vain for clues as to the identity or whereabouts of the attacker or the location of his weapon. They interviewed other residents of the victim's building and residents of a neighboring building to no avail; no one was observed fleeing the building. They brought in canine and attempted to track the assailant but were thwarted by the weather and the crowd. Under these circumstances, with the knowledge that an armed and vicious assailant was at large, and with reason to believe that he was still in the building, the police were presented with an emergency situation sufficient to justify their entry of the common areas of the building, including the unlocked laundry and boiler rooms, in an effort to locate and apprehend the culprit. This is especially plain to us inasmuch as the area entered by the police was the place in closest prox-

imity to the apartment in which the attack occurred. Furthermore, we are convinced that the police, in entering the utility area, were not merely conducting a broad exploratory search for evidence but were in fact entering that place to apprehend one whom they believed to be an imminent and lethal threat. Officer Weidmann testified to this fact, and it is evidenced by the fact that he specifically requested that Officer German accompany him into the utility area.

We are unimpressed by the fact that this entry into the utility area did not occur until somewhat over an hour after the crime itself. As the foregoing facts reveal, it was part of a continuing investigation. *Cf. Michigan v. Tyler,* 436 U.S. 499, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978). In similar circumstances, the Nevada court in *Hardin* found a two and one-half hour delay in entry to be insignificant. 518 P.2d at 155. Moreover, in a case involving "hot pursuit," our own Court of Appeals stated that a delay of well over an hour did "not compel the conclusion that the circumstances underlying [the] warrantless entry were not exigent." *Nilson v. State,* 272 Md. 179, 191, 321 A.2d 301 (1974).

Having established that the officers' entry into the boiler room was lawful, the subsequent seizure of the physical evidence found in plain view therein is easily justified. It is true that a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation." *Terry v. Ohio,* 392 U.S. 1, 26, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). However, the facts presented indicate that the evidence seized here was observed in plain view during a search so circumscribed. "And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities." *Mincey v. Arizona,* 437 U.S. 385 at 393.[1] Thus, the evidence sought to be suppressed here was lawfully obtained and properly admitted.

---

1. *See generally* Moylan, *The Plain View Doctrine: Unexpected Child of the Great "Search Incident" Geography Battle,* 26 Mercer L. Rev. 1047 (1975).

### Cross-Examination

Appellant's next contention is directed entirely at one particular segment of defense counsel's cross-examination of the victim:

> "Q  [Defense Counsel]: Didn't you also talk to another attorney, your own attorney about this case?
>
> A  [Victim]: Yes.
>
> Q  And isn't it a fact that that attorney advised you not to talk with me about the case?
>
> A  Yes, he did.
>
> Q  Is that because you intended to file suit against the management of the building[?]
>
> MS. CATTERTON [State's Attorney]: Objection.
>
> THE COURT: Sustained.
>
> MR. RUPP [Defense Counsel]: Your Honor, I think it goes to bias and motive.
>
> THE COURT: Sustained."

According to appellant, the question ("Is that because you intended to file suit against the management of the building?") was aimed at discrediting the victim's testimony by suggesting to the jury that the victim had an ulterior motive in linking appellant to this crime. Therefore, appellant asserts that, by prematurely foreclosing this effort, the trial judge denied him his constitutional right of effective cross-examination, thereby committing reversible error.

It is certainly true that there is a constitutional right of effective cross-examination. As articulated by the Supreme Court in *Davis v. Alaska,* 415 U.S. 308, 315, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974),

> "The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.' This right is secured for defendants in state as well as federal criminal proceedings under *Pointer*

> *v. Texas,* 380 U.S. 400 (1965). Confrontation means more than being allowed to confront the witness physically. 'Our cases construing the [confrontation] clause hold that a primary interest secured by it is the right of cross-examination.' *Douglas v. Alabama,* 380 U.S. 415, 418 (1965)."

It is equally well-established that this guarantee includes the right to cross-examine in an effort to reveal "the influence of possible bias in the testimony of a crucial identification witness." *Davis* at 319. Accordingly, we recognized in *State v. DeLawder,* 28 Md. App. 212, 344 A.2d 446 (1975) and declared most explicitly in *Deinhardt v. State,* 29 Md. App. 391, 397, 348 A.2d 286 (1975), *cert. denied,* 277 Md. 736, 741 (1976), that,

> "The opinion of the majority in *Davis* makes clear that the refusal to allow the defense to demonstrate bias on the part of the prosecutor's principal witness through cross-examination is a denial of Due Process under the Fourteenth Amendment as well as an infringement upon Davis's Sixth Amendment rights."

Nevertheless, we do not believe that the trial judge's ruling complained of in this case offends these well-settled precepts.

Appellant's argument implicitly assumes that the entire basis for the State's general objection and the trial court's accompanying sustention was relevancy. Stated more precisely, the objection would have been that whether the victim intended to file suit against the management of the building was irrelevant to the case being tried. If, in fact, this were the sole ground for the objection, defense counsel's proffer below that the question "goes to bias" would have been pertinent and appellant's argument here would be persuasive. Proof of a witness's bias is always relevant. 3 A.J. Wigmore, *Evidence* § 940, p. 775 (Chadbourne rev. 1970). Moreover, as *Davis, DeLawder* and *Deinhardt* proclaim, preventing defense counsel from showing bias —

at least on the part of a crucial identification witness — is constitutional error.

However, the question which generated the ruling complained of here did not simply ask the victim whether she intended to file suit; rather, by its terms, the question sought from the victim an explanation as to why her attorney had advised her not to talk with defense counsel. As such, the question called for the witness to express an opinion or draw a conclusion; it asked her to speculate as to her attorney's purpose in giving her the advice he did. For this reason, the question was objectionable, regardless of its relevance. *Brotherhood of Locomotive Firemen and Engineers v. Nash,* 144 Md. 623, 640, 125 A. 441 (1924); *Aetna Indemnity Co. v. George A. Fuller Co.,* 111 Md. 321, 345, 73 A. 738 (1909), *reargument denied,* 111 Md. 321, 74 A. 369 (1909). As a matter of evidentiary law, therefore, the objection was properly sustained. Furthermore, the judge's ruling did not abridge appellant's constitutional right of effective cross-examination, in that it did not foreclose the realm of bias or even the specific subject of a collateral civil suit from defense counsel's inquiry. Instead, the ruling merely prevented counsel from pursuing these matters by means of an improper question. There is no indication in the record that the trial judge would have again sustained an objection to defense counsel's inquiry as to the victim's bias had counsel approached the subject by properly reframing his question. Under these circumstances, we can find no error in the trial judge's ruling.

## Scientific Evidence

Appellant's third claim of error relates to the testimony of Jean Hostetler, a forensic chemist from the Montgomery County Police Department, who was called as a State's witness. At trial, Ms. Hostetler testified that she had analyzed blood samples taken from the victim, the appellant, and stains found on the various items of physical evidence previously mentioned. In addition to the traditional A, B, O blood groupings, Ms. Hostetler utilized an electrophoretic

technique in performing her analysis. As a result of this technique, the witness testified that she was able to — on the basis of their respective enzyme structures — more precisely compare the blood samples obtained. It was from these enzyme comparisons that the blood on the appellant's clothes and other physical evidence was matched to that of the victim.[2]

Before receiving testimony concerning these blood tests and their results, the trial judge held a hearing, outside of the presence of the jury, to determine the question of admissibility. At this hearing Ms. Hostetler was first qualified as an expert in forensic chemistry. In this regard she testified that she held a Bachelor of Science degree in biology and a Master of Science degree in forensic chemistry. Furthermore, Ms. Hostetler described several years of work experience in the field of forensic chemistry and stated that she was then teaching a college level course on the same subject. She also noted a number of professional organizations of which she was a member.

Having been thus qualified, Ms. Hostetler described the technique she had employed in analyzing the blood samples at issue in this case. As she explained, electrophoresis involves the application of an electrical current to a blood sample for a period of time, thereby causing the different enzymes present in the blood to separate into their protein components. After separation, the enzymes and their protein components can be identified and, in this way, the blood can be classified more specifically than is possible by the traditional A, B, O blood grouping.

As to the reliability of the described electrophoretic technique, Ms. Hostetler testified that it was developed in the late '60's and that it is now an accepted practice in the field of forensic chemistry. She testified further that she personally knew that electrophoresis was being utilized by the Montgomery County Police, the Baltimore Police, the

---

2. The blood on the knife was not identified by use of the described electrophoretic technique; rather, it was matched to the victim by use of the traditional A, B, O grouping only. The blood on the gloves, trousers and shirt was identified by both the A, B, O grouping and the electrophoretic technique as matching the blood of the victim.

Maryland State Police and the Federal Bureau of Investigation (FBI). Ms. Hostetler's testimony was uncontroverted. No expert witness was called by the defense, nor was any other evidence adduced to suggest that electrophoresis is regarded as either experimental or controversial. It was brought out on cross-examination of Ms. Hostetler that the electrophoretic technique at issue here is not typically used by hospital or other non-police labs. However, she explained that the reason for this is that enzyme structure does not affect blood compatibility for the purposes of transfusions and the like; therefore, aside from use in forensic and research labs, there is simply no need for the precision that this technique affords. On these facts, the trial judge concluded that the proffered scientific evidence was admissible and, therefore, allowed Ms. Hostetler to testify before the jury. Appellant contends that this was error; we disagree.

The only significant objection to this ruling which the appellant has registered on appeal is that Ms. Hostetler's testimony only established that the use of electrophoresis and enzyme comparison for the purpose of classifying blood samples is an accepted practice in the field of forensic chemistry. She did not and could not, according to appellant, demonstrate that this technique is generally accepted in the broader scientific community. Because of this limitation on the scope of Ms. Hostetler's opinion, appellant asserts that the State failed to satisfy the *Reed* standard governing the admissibility of scientific evidence.

To ensure fairness to litigants where scientific evidence is involved, the Court of Appeals in *Reed v. State,* 283 Md. 364, 391 A.2d 364 (1978), set forth a rule of admissibility requiring that the party seeking to introduce evidence generated by a scientific technique first demonstrate that the technique involved is considered reliable by those qualified to make such an assessment. Paraphrasing and elaborating upon a test established earlier in *Frye v. United States,* 54 U.S. App. D.C. 46, 47, 293 F. 1012, 1014 (1923), the Court of Appeals in *Reed* stated:

"[B]efore a scientific opinion will be received as evidence at trial, the basis of that opinion must be

shown to be generally *accepted as reliable within the expert's particular scientific field.* Thus, according to the *Frye* standard, if a new scientific technique's validity is in controversy *in the relevant scientific community,* or if it is generally regarded as an experimental technique, then expert testimony based upon its validity cannot be admitted into evidence." 283 Md. at 381 (emphasis added).

Contrary to appellant, we do not understand either the language or the reasoning of *Reed* to suggest that a scientific technique must be deemed legally unreliable simply because that technique has obtained general acceptance in only one branch of science.

By its terms, the *Reed* test states that a scientific technique is to be judged in the context of the "relevant scientific community" by experts in the "particular scientific field." *Id.* Furthermore, the Court in *Reed* explained:

"The identity of the relevant scientific community is, of course, a matter which depends upon the particular technique in question. In general, members of the relevant scientific community will include those whose scientific background and training are sufficient to allow them to comprehend and understand the process and form a judgment about it." *Id.* at 382.

We believe that Ms. Hostetler's demonstrated understanding of the electrophoretic technique at issue, drawn from considerable education and experience, plainly afforded an adequate foundation for her opinion and the trial court's ruling that the technique is accepted as reliable within the field of forensic chemistry. That her opinion did not exhibit acceptance of the technique in other fields is relevant perhaps, but certainly not controlling. We, therefore, conclude that the trial judge did not err in admitting the scientific evidence complained of.

## Sufficiency of the Evidence

Appellant's fourth and final contention is that the evidence was legally insufficient to support his conviction. As we explained in *Allen v. State,* 39 Md. App. 686, 690, 389 A.2d 909 (1978), *cert. denied,* 283 Md. 729 (1978), our review of this issue is quite limited:

> "We do not decide the guilt or innocence of the accused. In reviewing the sufficiency of the evidence in a jury trial, we do not inquire into and measure the weight of the evidence to ascertain whether the State has proved its case beyond a reasonable doubt. Rather it is our limited function to determine whether the evidence shows directly or supports a rational inference of the facts to be proved, from which the jury could fairly be convinced, beyond a reasonable doubt, of the offense charged."

In the present case, the record evidence shows that Mrs. Belcher was attacked and severely injured by a person wielding a knife. The specific intent to murder was not only inferable from the nature of Mrs. Belcher's injuries and the manner in which they were received, but was expressly articulated by the assailant. Furthermore, the evidence identifying appellant as the criminal agent, though largely circumstantial, was abundant and highly probative. Mrs. Belcher testified, that, at one point during the attack, she thought that she recognized the assailant's voice as being that of the appellant. Little over an hour after the attack, appellant was found hiding in the boiler room, a room adjacent to the apartment in which the crime occurred. When found, he had blood on his shirt and trousers. Appellant was also found to have a key to the victim's apartment on his person at the time of the arrest; this corresponded with the fact that the victim's apartment showed no signs of forced entry. In addition to appellant, the police discovered certain physical evidence in the boiler room, including gloves and a knife, both of which were bloodstained. The blood on these

articles, as well as that found on the appellant's shirt and trousers, was matched to the blood of the victim. The blood of the appellant and the victim was not of the same enzyme structure, nor even the same type. A sheath for the knife was also found in the boiler room; it contained no blood but bore the name "Gary Robinson." The defense produced no witnesses to rebut or explain any of this extremely incriminating evidence.

Still, appellant claims that there is a crucial flaw in the evidence rendering it legally insufficient: although there was blood on both the gloves and the knife that were found in the boiler room, the blood on the knife was confined to the blade; according to appellant, there was no blood on the handle of the knife. This condition of the physical evidence, appellant suggests, is illogical and somehow irreconcilable with a finding of guilt. Our review of the record reveals that the knife was bloodstained, but the record does not clearly indicate to us that those stains were on one part of the knife and not the other. Nevertheless, even assuming that the facts in this regard are as appellant suggests, we must affirm.

The absence of blood on the knife handle, given the presence of blood on the gloves, is somewhat curious but certainly not inexplicable. Moreover, defense counsel pointed up this discrepancy to the jury in his closing argument, and apparently they did not consider it to be significant. In light of the other evidence adduced, we cannot say that they acted irrationally. Quite to the contrary, we believe that the evidence was more than sufficient to convince a rational jury beyond a reasonable doubt that appellant was guilty of assault with intent to murder.

*Judgment affirmed; costs to be paid by appellant.*