**Steven REDMAN, Petitioner,**

**v.**

**James THIERET, Respondent.**

**No. 86–3353.**

United States District Court,
C.D. Illinois,
Springfield Division.

July 30, 1987.

Steven R. Redman, pro se.

Judith H. Schlessinger, Asst. Atty. Gen., Springfield, Ill., for respondent.

## OPINION ORDER

MILLS, District Judge:

Habeas corpus.

Rape, deviate sexual assault, armed robbery.

30 years.

Redman brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his Illinois state court convictions. The gist of Redman's complaint is that two erroneous evidentiary rulings by the trial judge rendered his trial fundamentally unfair:

(1) the trial court's refusal to admit evidence that the victim tested positive for oral gonorrhea shortly after commission of the crimes, while Redman had not; and

(2) the court's admission of expert testimony concerning the similarity of Redman's blood characteristics to semen stains found in the victim's car.

In response, the warden launches a two-pronged attack upon Redman's petition: he argues that (1) Redman waived his right to object to one of the rulings, and (2) the trial judge's evidentiary rulings were correct. Alternatively, Warden Thieret maintains that even if the trial judge made mistakes,

they were not serious enough to deprive Redman of a fair trial.

We agree with the warden. Writ denied.

Before proceeding with a discussion of the legal question, a short review of the facts relevant to the issues raised is in order. A more complete factual recitation is contained in the Illinois Appellate Court's decision. *People v. Redman,* 135 Ill. App.3d 534, 90 Ill.Dec. 361, 481 N.E.2d 1272 (4th Dist.1985).

### Background

On the evening of February 26, 1984, Redman and the female victim were visiting Skateland South in Springfield. There, Redman initiated a conversation with the victim and learned that she had driven her parents' car to the rink and the location of the car. At about 8:15 p.m., as she was entering the car, a man wearing a face mask jumped out from behind the car and, at knifepoint, forced her to drive to a different location. After robbing her of $40, the assailant forced her to perform fellatio on him and then to have sexual intercourse with him. He ejaculated on the back seat, samples of which were later recovered.

After its investigation of the crime, the state charged that Redman was the perpetrator of the attack. Prior to trial, it filed a motion *in limine* to prevent Redman from introducing evidence that the victim was diagnosed as having oral gonorrhea six days after the rape. A similar test of Redman's blood indicated that he did not have gonorrhea. In its motion, the state maintained that this evidence was inadmissible as evidence of prior sexual conduct by the victim with a person other than the defendant and would thus violate the Illinois rape shield law. Ill.Rev.Stat. ch. 38, ¶ 115–7 (1983). Additionally, the state contended that in the absence of extensive medical testimony, the evidence could not be used to either establish or negate the identity of the assailant.

Besides arguing that the rape shield statute did not bar the introduction of this evidence, defense counsel maintained that the evidence was highly probative on the ultimate issue of Redman's guilt. Counsel

was, however, unable at that time to lay any foundation for its admissibility other than to introduce a statement from a Springfield venereal disease clinic that there is an 80–85% chance of contracting gonorrhea through sexual contact with an infected individual. Faced with this dearth of evidence, the trial court allowed the state's motion *in limine* until such time as the defense introduced some evidence to show a connection between Redman's freedom from gonorrhea and the issue of his identity as the assailant.

During Redman's case in chief, defense counsel made an offer of proof with respect to the motion. In the offer, the defense presented the testimony of Dr. Sergio Rabinovich, a specialist in internal medicine and infectious diseases at the Southern Illinois University School of Medicine. Counsel posited to Dr. Rabinovich this hypothetical question:

QUESTION: Let me ask you, doctor— I'm going to ask you to make assumptions. I'm going to ask you to assume that there was sexual contact between someone with gonorrhea and someone who did not have gonorrhea, and the form of that sexual contact would be oral-genital, the person having gonorrhea having placed her mouth upon the sex organ or the penis of someone who did not have gonorrhea. I'm going to ask you if you can give a probability that the gonorrhea would be passed as a result of that sexual act.

Dr. Rabinovich responded:

ANSWER: To my knowledge, there is no information—literature that gives me enough information to give you a probability.

Upon further questioning, however, he expressed the opinion that the probability of passing oral gonorrhea through oral-genital contact was low. Dr. Rabinovich also testified that the gestation period for oral gonorrhea was anywhere from 24 hours to 7 days after contact; thus, any symptoms would begin to appear during this period. Further, he testified that drugs such as penicillin or tetracycline will—98% of the time—cure a patient with the disease with-

in two minutes after the drug is administered. After hearing this evidence, the trial court again reaffirmed its ruling allowing the state's motion *in limine.*

On appeal, the appellate court ruled that the trial court correctly refused to admit Dr. Rabinovich's testimony. As the court reasoned:

> The doctor here was unable to express an opinion based upon a reasonable degree of medical certainty that the disease would be likely transmitted through oral-genital contact. The time between the attack and the defendant's testing for the disease was so lengthy that the trial court was correct in its determination that the evidence here was lacking in relevancy.

Also during trial, in the state's case in chief, the court admitted into evidence—without the objection of defense counsel—the testimony of Debra Fesser, a serologist with the Illinois Department of Law Enforcement. She testified that based upon a blood testing technique called "electrophoresis" performed in her laboratory, Redman's blood had three characteristics that matched those of the semen found in the victim's car. According to Ms. Fesser, 1.8% of Caucasians would exhibit the same characteristics found in Redman's blood. Ms. Fesser arrived at this conclusion through the use of "population frequency statistics" compiled by the American Blood Bank Association and several other experiments in blood typing. Using these statistics and the three traits exhibited by Redman's blood that matched those of the semen, Fesser reached the 1.8% figure. And based upon this figure, the state's attorney in his closing statement argued that because half of the population is female, less than 1 person in 100 could have had blood characteristics matching the Defendant's and, thus, only the same percentage could have been the source of the semen found in the victim's car. On appeal, Redman did not challenge the accuracy of the figures themselves, but instead argued that the population frequency testimony was unfairly prejudicial.

In its decision, the appellate court first held that defense counsel's failure to object at any time before the trial court to Ms. Fesser's testimony constituted a waiver of any claimed error. In addition, the court held that the "plain error" exception to the waiver rule was inapplicable because: (1) the error was not of such magnitude that the accused was denied a fair trial, and (2) the other evidence of Redman's guilt was overwhelming. In so holding, the court noted that although the First District has held that testimony concerning the statistical probability of matching blood types is inherently unreliable and prejudicial, *see People v. Harbold,* 124 Ill.App.3d 363, 79 Ill.Dec. 830, 464 N.E.2d 734 (1984), other courts have held to the contrary. *See, e.g., Robinson v. State,* 47 Md.App. 558, 425 A.2d 211 (1981); *State v. Washington,* 229 Kan. 47, 622 P.2d 986 (1981). Thus, while the court concluded that Ms. Fesser's testimony was not erroneously admitted, it also held that even assuming *arguendo* the testimony should not have been admitted, the overwhelming evidence of Redman's guilt rendered the plain error exception inapplicable.

### Standard of Review

We begin our analysis with several well-established principles regarding habeas corpus jurisdiction under 28 U.S.C. § 2254. A federal court may not grant habeas relief to a petitioner in state custody unless the custody violates federal statutory or constitutional law. *Mosely v. Moran,* 798 F.2d 182, 185 (7th Cir.1986). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimensions." *Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982). Ordinarily, an evidentiary error in the state courts will not rise to the level of a constitutional violation. *Burrus v. Young,* 808 F.2d 578, 580 (7th Cir.1987). As the Seventh Circuit has explained, "Because the admissibility of evidence in state court is a matter of state law, evidentiary questions are not subject to federal review under § 2254 unless there is a resultant denial of fundamental fairness or the deni-

al of a specific constitutional right." *United States ex rel. DiGiacomo v. Franzen*, 680 F.2d 515, 517 (7th Cir.1982).

Thus, the issue facing this Court differs from that previously faced by the Appellate Court of Illinois. The question is not simply whether the evidentiary rulings were incorrect, but rather whether, in light of the entire record, the rulings so prejudiced Redman as to deprive him of a fair trial in violation of the Fourteenth Amendment. *United States ex rel. Bartall v. Lane*, 607 F.Supp. 409 (N.D.Ill.1985) (*citing Phelps v. Duckworth*, 757 F.2d 811, 820 (7th Cir.1985)). In determining whether such prejudice has occurred, the strength of the prosecution's case and the extent to which it is dependent upon the evidence erroneously admitted are relevant factors. *United States ex rel. Palmer v. DeRobertis*, 738 F.2d 168, 170 (7th Cir.1984).

■ We first examine Redman's contention that the trial court's ruling excluding the evidence that the victim was diagnosed as having oral gonorrhea six days after the attack denied him his federally protected right to a fundamentally fair trial. As stated above, to decide this question, we do not consider solely whether the ruling was correct, but instead whether the ruling violated Redman's rights under the Fourteenth Amendment.

In the case at hand, however, the trial court's ruling was, in our view, correct. Hence, there is no possibility that the ruling denied Redman the right to a fair trial. As the record demonstrates, defense counsel was given numerous opportunities to establish the threshold relevance of this evidence, but was unable to do so. Indeed, Dr. Rabinovich himself admitted that the probability of transmitting gonorrhea through oral-genital contact was low. More importantly, he was unable to testify to a reasonable degree of medical certainty about the probability that gonorrhea would be passed through such contact. Given Dr. Rabinovich's testimony, it was not error for the trial court to exclude the evidence, and no constitutional concerns are raised.

Redman's more serious contention is that the trial court's admission of population frequency statistics based on blood typing denied him a fair trial. This contention is more serious because of the apparent split among the state courts concerning the propriety of introducing statistics that are based upon the frequency of finding an individual with a defendant's specific blood characteristic in a given population. The Illinois Supreme Court has not addressed the question of whether probability statistics may be used in a criminal trial for the purpose of establishing a historical fact.

■ At the heart of the debate is the impact that kind of evidence has upon a jury.[1] Also subject to debate is how this evidence impacts upon the state's burden of proving guilt beyond a reasonable doubt. On one end of the spectrum is *People v. Harbold*, a case which considered in depth the probative value of the probability statistic with regard to blood type matching. In that court's view, probability statistics give "a false impression of precision in the measurement of guilt," and thus are more misleading to a jury than helpful. As *Harbold* expressed:

> Here ... the state ... expressed the similarity between the perpetrator and defendant in terms of the likelihood of a random match. Our concern is more with the impact of the probability statistic upon the jury than the foundation for the testimony. The statistic was patently irrelevant. The probability theory is necessarily silent on the crucial question before the jury: of the relatively small percentage of the population with consistent characteristics, which one, if any committed the crime? ... Jurors would be hardpressed to explain how the one-in-five hundred chance of an accidental

---

1. Redman also argued on appeal that the electrophoresis technique itself has not been proven reliable. However, even the Illinois case most critical of blood typing analysis, *People v. Harbold,* did not find the technique unreliable as a matter of law. And in this case, both the trial judge and the appellate court found the technique reliable. Without expressly resolving the question, we cannot now hold it so unreliable as to deny Redman his constitutional right to a fair trial.

match did not equate with a one-in-five hundred chance that the defendant was innocent ... Of course, the statistic means nothing of the sort. Absent a sound basis to limit the number of possible defendants, the defendant here is but one of thousands of people who share the same characteristics. Legion possibilities incapable of quantification, such as the potential for human error or fabrication, or the possibility of a frame-up, must be excluded from the probability calculation. We believe that testimony to statistical probabilities encouraged the jury to disregard evidential risk traditionally weighed in determining guilt or innocence, and focused unfairly on numerical conclusions ... As such, we find that the testimony violated one of the primary requirements of expert opinion, that the opinion be of an aid to the jury.

124 Ill.App.3d at 383, 79 Ill.Dec. 830, 464 N.E.2d 734. On the other hand, and as the state appellate court here implicitly held, a court's distrust of the jury's ability to critically view the value of population frequency statistics should not alone justify their exclusion. Three other Illinois Appellate Court decisions so hold. *See People v. Bush,* 103 Ill.App.3d 5, 58 Ill.Dec. 482, 430 N.E.2d 514 (1981) (expert allowed to testify that the population frequency for ABO–A, ES D2–1 is 8%); *People v. Henderson,* 83 Ill.App.3d 854, 39 Ill.Dec. 8, 404 N.E.2d 392 (1980) (testimony concerning percentages of the population having a particular ABO classification of blood properly admitted); *People v. Gillespie,* 24 Ill.App.3d 567, 321 N.E.2d 398 (1974) (same). Moreover, the appellate court here accepted the reliability of the electrophoresis technique based upon two cases from other jurisdictions which extensively reviewed the accuracy of the procedure. *See Robinson v. State,* 47 Md.App. 558, 425 A.2d 211 (1981), and *State v. Washington,* 229 Kan. 47, 622 P.2d 986 (1981).

■ Certainly, the *Harbold* case raises serious questions about both the evidentiary value of, and the possible prejudice that can result from, the use of population frequency statistics in a criminal trial. Still, we do not need to provide a definitive solution to the problem here, since we find that Redman was afforded a fair trial. And this Court, as a *federal* tribunal, is loathe to interfere in the state law's development of this issue. The briefing before this Court is not adequate for it to attempt to finally resolve the issue, and, more importantly, it is not our place to do so. Our function now is only to insure that the State of Illinois provided Redman a fundamentally fair trial.

And based upon our review of the entire record, we conclude that it did. In our view, the Court's arguably erroneous admission of population frequency statistics based upon blood typing—the propriety of which is still open to debate—does not in this case rise to a constitutional plane. As the Court in *Harbold* explained, the key to the issue is the helpfulness of the evidence as weighed against its tendency to mislead. Even if it could be concluded that the balance tips in favor of exclusion, it does not tip so far as to completely warp the jury's ability to judge the weight that should be accorded the evidence. At best, the statistics merely narrowed the possible range of suspects, and the jury was in a position to accord the evidence its proper weight. Thus, the fundamental fairness of Redman's trial was not implicated by their admission.

Finally, we agree with the appellate court that Redman's failure to object to the introduction of the statistical evidence during the trial amounts to waiver under the circumstances of this case. Under both the Illinois "plain error" exception to the waiver rule and the fair trial standard of review applicable here, the overwhelming evidence of Redman's guilt also prohibits our issuance of the writ.

Accordingly, Redman's petition for a writ of habeas corpus is DENIED.

Case CLOSED.