**UNITED STATES of America ex rel.
Kurt BARTALL, Petitioner,**

v.

**Michael P. LANE, Respondent.**

**No. 84 C 4497.**

United States District Court,
N.D. Illinois, E.D.

April 9, 1985.

John T. Theis, Chicago, Ill., for petitioner.

Neil F. Hartigan, Atty. Gen., State of Illinois, James Fitzgerald, Asst. Atty. Gen., Chicago, Ill., for respondent.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Kurt Bartall ("Bartall") sues under 28 U.S.C. § 2254 ("Section 2254") for habeas corpus relief from his Illinois state court conviction for murder and the resulting 20-year sentence. For the reasons stated in this memorandum opinion and order, Bartall's petition is denied.

### Background

At 2:30 a.m. December 30, 1979 Bartall fired two shots from his automobile while he was driving along Milwaukee Avenue in Chicago. Bartall's second shot killed Betty Quinn ("Quinn"), who was standing in a nearby parking lot. At trial Bartall conceded he had fired the fatal shot (though he had initially given a sharply different account). Thus essentially confronted with a choice between murder and involuntary manslaughter, the jury found Bartall guilty of murder and armed violence.

Bartall obtained a 2–1 reversal of his conviction from the Illinois Appellate Court, 105 Ill.App.3d 867, 61 Ill.Dec. 663, 435 N.E.2d 152 (1st Dist.1982). On further appeal the Illinois Supreme Court unanimously reversed the Appellate Court and affirmed the conviction, 98 Ill.2d 294, 298, 74 Ill.Dec. 557, 456 N.E.2d 59 (1983).

### Evidence at Trial

Because the two reported opinions on Bartall's appeals afford a thorough statement of the evidence, a summary will suffice here. Other critical facts will be dealt with at appropriate places in this opinion.

On the evening of December 29, 1979 Quinn had visited a tavern on Milwaukee Avenue with her friend Eileen Kampwirth ("Kampwirth"). Quinn had parked her car in a lighted grocery-store parking lot about a half block from the bar.

At about 2:30 a.m. Quinn, Kampwirth, Bill Will ("Will") and another friend of Kampwirth left the bar and went to put some gasoline in the empty tank of Quinn's car, which was parked about 12 feet from the Milwaukee Avenue curb. Will and Kampwirth testified there were no other cars or people in the lot or along the Milwaukee Avenue curb. There is no wall, fence or other obstruction between the parking lot and Milwaukee Avenue.

While the four were gathered next to Quinn's car, Will heard two loud bangs no more than 45 seconds apart. After the second bang he looked out and saw an automobile traveling down Milwaukee Avenue, away from the lot, at a normal rate of speed. Will then looked down and saw Quinn lying on the ground, bleeding profusely from her face. Kampwirth, a nurse, tried to revive Quinn, but Quinn was pronounced dead at a nearby hospital.

Over Bartall's objection the trial court admitted testimony of a later shooting incident as evidence bearing on Bartall's intent in the Quinn homicide. Kathy Preze ("Preze") testified that some 20 hours after the Quinn shooting she was driving down Milwaukee Avenue, not far from the site of the shooting, when a car suddenly pulled in front of her and slammed on its brakes. She swerved around it, heard a loud bang and continued on. Then the car pulled up even with her again. Its driver, whom she later identified as Bartall, made an obscene gesture and pointed a gun at her. When she saw the gun she swerved into oncoming traffic and heard another bang. Bartall's car sped away with its lights out.

Preze drove immediately to a police station to report the incident. Bartall was arrested a few hours later, and a gun and shoulder holster in his possession were seized. Initial examination of Preze's car disclosed a bullet hole just above the left rear tire, and about two months later Preze discovered a bullet lodged in a box in the car's trunk. Ballistics testing confirmed

the bullet had been fired from Bartall's gun.

When Bartall was first questioned by Detective Frank Capitelli the night of his arrest, he claimed (1) he had been in Wisconsin the previous night (when Quinn was shot) and (2) he had bought his gun in Wisconsin the morning after the shooting. Later he changed his story, admitting:

1. He had gone to Wisconsin only after, not before, the shooting.

2. He had driven down Milwaukee Avenue the morning of December 30 with his girlfriend Cindy Kerstein ("Kerstein") and fired two shots out of his open window.

That last admission was significantly tempered by two claims: one, that he had looked around and had not seen anyone on the street or in the parking lot before he fired; and the other, that he had fired his gun in an upward direction. When pressed by Capitelli on the latter score, however, Bartall admitted he may not have fired upward.

Bartall's theory at trial was that he had merely been out taking potshots, that he had not seen Quinn or the others and that the bullet that struck Quinn probably ricocheted off some higher object in the parking lot. To rebut that "accident" scenario the state presented:

1. testimony by Will and Capitelli that the parking lot was well lighted (the jury was also given the opportunity to view the scene at night); and

2. evidence of two kinds that the bullets had traveled in a horizontal line:

(a) Capitelli testified a bullet fired from Bartall's gun (the first shot heard by Will) had been recovered from Rose Cleaners a few doors away from the parking lot. That bullet entered the shop's front window six feet above the ground.

(b) Testimony by the medical examiner who had performed Quinn's autopsy stated:

(1) He had recovered two bullet fragments from her head that were traced to Bartall's gun. Undoubtedly anticipating Bartall's arguments that the separated fragments may have resulted from a ricochet, the state also elicited the medical examiner's testimony that fragmentation could have resulted from the bullet's impact with Quinn's skull.

(2) Bartall's fatal bullet had traveled in a horizontal line from the back of Quinn's head through her brain and exited just above her right eye. After that testimony the jury was shown a picture of Quinn's face, revealing the exit wound above the right eye.

Bartall's only witness was Kerstein, who had accompanied him during both shooting incidents. Kerstein testified at a preliminary hearing she had seen people on the sidewalk just after Bartall fired the shot that killed Quinn. At trial, however, she testified the windows had been so covered with dirt and slush that she could not see out of them. Nevertheless, on cross-examination she admitted she had seen people on the sidewalk a few blocks farther down Milwaukee Avenue after the shooting.

Kerstein also testified she was asleep in the car the evening of the Preze incident when Bartall slammed on his brakes. She awoke to hear him say angrily, "She cut me off. She cut me off" (R. 440). She testified Bartall then said he was going to shoot the tires out of the other car, but that remark was stricken from the record after the prosecutor's objection.

Bartall lists no fewer than sixteen grounds for habeas relief. Because a number of them may conveniently be grouped together, his objections can be summarized in these terms:

1. insufficiency of the evidence as a whole;

2. improper admission of the evidence about the Preze incident;

3. failure of the trial court to give proper limiting instructions as to the Preze evidence;

4. striking of Kerstein's testimony that Bartall said he would shoot out Preze's tires; .

5.  numerous incidents of prosecutorial misconduct;

6.  admission of highly prejudicial evidence: the photograph of Quinn; Kampwirth's testimony about her attempt to revive Quinn; Bartall's gun and holster; and Capitelli's testimony that he twice read Bartall his Miranda rights; and

7.  bias of the trial judge in favor of the State.

### Sufficiency of the Evidence

■ Bartall asserts the evidence was insufficient to prove him guilty beyond a reasonable doubt. That familiar claim evokes the by-now familiar response from *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) recently quoted in *United States ex rel. Foster v. DeRobertis,* 741 F.2d 1007, 1012 (7th Cir.1984):

> [T]he federal formulation of review of the sufficiency of the evidence is whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Ill.Rev.Stat. ch. 38, ¶ 9–1(a)(2) provides a person commits murder if,

> in performing the acts which cause the death ... he knows that such acts create a strong probability of death or great bodily harm to that individual or another.

Under that standard the State was not required to prove Bartall had a specific intent to kill Quinn. It had to show (beyond a reasonable doubt, of course) only (98 Ill.2d at 307–09, 74 Ill.Dec. at 563–564, 456 N.E.2d at 65–66):

1.  Bartall saw a group of people standing in the parking lot.

2.  He voluntarily fired a gun in their direction.

There was ample evidence in the record from which the jury could rationally infer both those elements.

As to whether Bartall saw Quinn and her friends, there was direct evidence—both testimony and the jury's own observation of the parking lot—proving the lot was well lighted. Both testimonial and photographic evidence demonstrated Bartall's view of the lot was unobstructed. Although Bartall claimed he did not see the group of people, his statement acknowledged his window was open and he looked into the lot before he fired. Kerstein's testimony that the windows were dirty is not only suspect (given her contradictory statements and the photographs indicating the windows were clean) but also immaterial because *Bartall's* window was down. Unquestionably the jury could reasonably infer Bartall saw the group.

As to whether Bartall voluntarily shot in the direction of the group (rather than, as he claimed, into the air or at another object), all the objective evidence proves both bullets traveled horizontally. One struck Rose Cleaners' window only six feet above the ground, and the fatal bullet traveled horizontally through Quinn's head. Indeed, although Bartall at first told Capitelli he had fired in an upward direction, he later admitted he may not have done so. Finally, the jury could have considered Bartall's flight to Wisconsin after the Quinn shooting, with his initial false statement to the police, as indicating he knew he had shot more than just a store window.

In sum, both factors called for by the Illinois statute were more than amply supported. As both Illinois appeals courts concluded, there was more than sufficient evidence for a rational jury to find Bartall guilty of murder beyond a reasonable doubt.

### Fairness of the Trial

■ Bartall charges his trial was tainted by improper evidentiary rulings and prosecutorial misconduct. Of course this Court does *not* sit as a super-appellate court for such claims:

1.  Because the evidentiary rulings were matters of state law, they may not serve as a basis for habeas corpus relief unless they resulted in denial of a specific constitutional right or a denial of a fundamentally fair trial. *Foster,* 741

F.2d at 1014. Improper admission of evidence may rise to the level of a due process violation only if the probative value of the evidence is greatly outweighed by prejudice to the defendant. *United States ex rel. Bibbs v. Twomey,* 506 F.2d 1220, 1222 (7th Cir.1974).

2. Precisely the same due process analysis applies to allegations of prosecutorial misconduct. *United States ex rel. Crist v. Lane,* 745 F.2d 476, 482 (7th Cir.1984) (citations omitted) stated the standard:

> The focus of federal due process review is to ensure that alleged improper prosecutorial argument does not warp the factfinding function of the jury by deflecting its attention away from consideration of the evidence presented at trial.... The essence of due process is fundamental fairness. The Constitution guarantees a fair trial, not a perfect one.... A trial is fundamentally fair if it results in a verdict reached through consideration of evidence properly admitted and which is untainted by improper influences. Thus, it is the totality of the effect of the alleged errors, not their mere presence or their number, which gives rise to, or defeats, a due process claim.

■ Even after errors in the trial have been demonstrated, sharply different tests may apply, depending on whether or not those errors implicate the violation of a specific provision of the Bill of Rights. *Phelps v. Duckworth,* 757 F.2d 811, 820 (7th Cir.1985) reaffirms the teaching of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967): Such a Bill of Rights violation infects a conviction unless the reviewing court is satisfied the error was harmless beyond a reasonable doubt. Conversely, an error such as prosecutorial misconduct that un-

dermines a trial's fairness and implicates the Fourteenth Amendment directly, rather than via a Bill of Rights guaranty, will justify habeas corpus relief only if the petitioner shows that error likely affected the trial's outcome. *United States ex rel. Shaw v. DeRobertis,* 755 F.2d 1279, 1281 n. 1 (7th Cir.1985).

In every case of this nature, the trial must be viewed in its totality. But just as the jigsaw puzzle that makes up the trial evidence can come in only one piece at a time, this Court must examine the claims of error one by one. Given the *Phelps-Shaw* dichotomy, it is appropriate to deal with the most serious evidentiary claim first, then turn to the unquestionable misconduct of Assistant State's Attorney Goggin.

### 1. *Evidence of the Preze Incident*

■ Under both Fed.R.Evid. 404(b) and Illinois law, evidence of other crimes may be introduced to indicate motive, intent, pattern or some other element of the crime at issue, unless the probative value of the evidence is significantly outweighed by its prejudicial effect. *People v. McKibbins,* 96 Ill.2d 176, 182, 70 Ill.Dec. 474, 476–77, 449 N.E.2d 821, 823–24 (1983) (approved and quoted by the Illinois Supreme Court in *Bartall,* 98 Ill.2d at 309–10, 74 Ill.Dec. at 564, 456 N.E.2d at 66); *United States ex rel. Durso v. Pate,* 426 F.2d 1083, 1086 (7th Cir.1970). Here the State claims evidence of the Preze incident was properly admitted to show Bartall's intent or design when he shot Quinn.

Bartall says admission of that evidence was prejudicial error. In his view the Preze incident was so dissimilar to the Quinn shooting it was in no way probative of Bartall's state of mind when he shot Quinn.[1] Bartall points out Betty Quinn

---

**1.** Bartall also makes much of the fact that in his opening statement the prosecutor misled the jury about the purpose of the Preze evidence when he told the jury that evidence would offer "insight into [Bartall's] character and his personality" (R. 55). But neither that comment—distant in time from presentation of the evidence—nor Judge O'Malley's refusal to give a

limiting instruction at the time the evidence was presented created any problem that was not entirely cured by Judge O'Malley's giving IPI limiting instruction 3.15 in his charge to the jury. Moreover, the limiting instruction's reference—to which Bartall also objects—to the nonissues of "presence" and "identity" (issues really

was a complete stranger to him, her shooting was unprovoked and he drove away from the scene at a normal speed. In contrast, he says:

1. Kerstein's testimony would indicate the Preze incident was provoked when Preze cut Bartall off in traffic.

2. Both the bullet hole above Preze's tire and Kerstein's stricken testimony suggest Bartall shot at the tire, not at Preze.

3. Bartall fled from the Preze scene at high speed with his lights off.

Although Bartall's version of the Preze incident would distinguish it significantly from that involving Quinn, that ignores the *Jackson* standard. Preze testified to exactly the opposite: She did not provoke Bartall, who without warning or cause pointed the gun at her face. Thus the jury could reasonably have believed Bartall attempted to shoot Preze, not her tire, but was thrown off when she swerved into oncoming traffic. From that perspective the jury could rationally have found the incidents strikingly similar, as did the Illinois Supreme Court. As Justice Simon put it (98 Ill.2d at 311–12, 74 Ill.Dec. at 565, 456 N.E.2d at 67):

> The evidence of the Preze shooting showed more than the defendant's general propensity to commit crime; it established that on at least two occasions within 24 hours the defendant had acted as a roving, mobile sniper.

Thus (*id.*) the Preze evidence "could provide the basis for an inference that [Bartall] had the criminal intent required for murder" the night of the Quinn shooting. Hence admission of the Preze episode raises no due process concerns.

■ It is true the jury was not tendered all possible evidence bearing on the Preze incident. Judge O'Malley erred in excluding Kerstein's testimony that Bartall "said he was going to shoot [Preze's] tires out." That statement, the Illinois Supreme Court correctly found, was admissible as a "statement of intent" exception to the hearsay rule (98 Ill.2d at 319, 74 Ill.Dec. at 569, 456

N.E.2d at 71). Nevertheless the Supreme Court viewed exclusion of the statement as harmless error, because it would have been merely cumulative of the evidence already in the record that the bullet had struck Preze's car just above the tire (*id.*).

That analysis is flawed in evidentiary terms (perhaps an illustration of hard cases making bad law?). After all, location of the bullet hole was merely circumstantial evidence, subject to the inference it resulted not from Bartall's aim but rather from Preze's evasive tactics. By contrast Kerstein's statement was direct evidence on the sole issue for which evidence of the Preze incident was admitted: Bartall's intent. Kerstein's statement was probative evidence, and its significance cannot be entirely dismissed (as the Supreme Court, *id.*, suggested) because the prosecution had attacked Kerstein's credibility on cross-examination.

Again however the issue for this Court differs from that facing the Illinois Supreme Court: Here the question is not simply whether the Kerstein ruling was incorrect, but rather whether, in light of the entire record (*Phelps*, at 820), it so prejudiced Bartall as to deprive him of a fair trial in violation of the Fourteenth Amendment. It did not. Even though exclusion of the testimony was erroneous and even though the ruling somewhat limited Bartall's defense on the issue of intent, it did not prevent Bartall from presenting his defense or arguing from the circumstantial evidence that he had shot at the tire. In summary, Kerstein's testimony was more than cumulative, but not so crucial that it would likely have affected the jury's verdict.

That conclusion is reinforced by the strength of the State's case against Bartall. When the Illinois Appellate Court said the "jury was presented with a very close case" (105 Ill.App.3d at 873, 61 Ill.Dec. at 668, 435 N.E.2d at 157), it had found the Preze incident wholly inadmissible. Without any evidence of that episode, the Appel-

conceded by Bartall) cannot possibly have prej-

udiced Bartall.

late Court's characterization of the case might well be accurate, forcing close scrutiny of any other errors. *Shaw,* at 1281, 1284. But the Preze incident clearly tips the balance heavily in favor of the State, so that only truly egregious errors in evidentiary rulings would pose the risk of violating Bartall's due process rights. *United States ex rel. Palmer v. DeRobertis,* 738 F.2d 168, 170 (7th Cir.1984).

As this opinion observed immediately before launching this discussion of the Preze incident, this Court's inquiry is not ended by its conclusion that exclusion of the Kerstein statement does not in itself violate Bartall's due process rights. This Court must still consider "the totality of the effect of the alleged errors" (*Crist,* 745 F.2d at 482). Accordingly this opinion turns to an examination of whether the prosecutor's activities so tainted the jury's verdict as to render it constitutionally infirm.

2. *Prosecutorial Misconduct*

■ To the Supreme Court prosecutor Goggin's closing statements were "improper, inexcusable and unprofessional" (98 Ill.2d at 323, 74 Ill.Dec. at 571, 456 N.E.2d at 73). Those accurate pejoratives might well be supplemented by "shocking" and "deliberate." For convenience in discussion the improper statements may be grouped in three categories.[2]

(a) *Ad hominem attacks on Bartall*
   See, he's a punk (R. 512).

     \*    \*    \*    \*    \*    \*

   [Bartall] made a mistake because he fired at Kathy Preze the next day like the jerk he is and got caught (R. 515).

     \*    \*    \*    \*    \*    \*

   This is what he was wearing, the big man that he thought he was wearing a shoulder holster. Walking into a pizza place with the holster and the gun on. What kind of person is that? (R. 515)

     \*    \*    \*    \*    \*    \*

---

**2.** Most of the prosecutorial misconduct was that of Goggin, who was the last lawyer to speak to the jury. His co-prosecutor was responsible

And then the responsibility of the defense attorney. The responsibility of the defense attorney is to represent the man who pays him. That man. The man who now hangs his head and sniffles in the courtroom, the same man that was arrested in his T-shirt with his tattoos and his beard and long hair, with a shoulder holster and his .9 millimeter semi-automatic fully loaded weapon in Niles after almost blowing away Kathy Preze. He's got a suit on now and cries periodically (R. 543).

All those comments are obvious attempts to prejudice the jury and convince it to convict Bartall because he is a bad man. Their intended effect is clearly to focus the jury's attention on impermissible considerations, not the evidence.

(b) *Prosecutorial testimony*

■ Bartall argues prosecutor Goggin twice commented on matters outside of the record. As to the illumination in the parking lot, Goggin stated in rebuttal (R. 554):

   . I stood on the street last night. I could see. It's illuminated on this side of the street and illuminated on that side of the street.... I'm from Chicago. That's one of the most well lighted streets I've ever been on.

As to Kerstein's credibility, Goggin said (also on rebuttal, R. 546–47) (emphasis added to focus Bartall's objection):

   What else did she lie about? *And this is the part that blows your mind when you are the prosecutor and you know all the facts in the case, this is the part that really gets to me.* I talked to that girl in Branch 66. He brought her in to me. The defense, who's representing the defendant, to my office. I talked to her. I had the photographs then. These photographs were taken the night of the crime, and that girl has the audacity to swear to God to tell the truth, to get on that witness stand and tells you that those windows were clouded with slush

---

only for the first three statements next quoted in the text (those were made as part of the State's initial closing argument).

because it had been snowing out and slush and all that nonsense.

Bartall plainly overstates the significance of the first comment. On the night before closing argument (the night referred to by Goggin), the jury had accompanied the judge, the prosecutor, defense counsel and Bartall to the parking lot and viewed the lighting conditions for itself. Goggin's statement, cast by Bartall as prosecutorial testimony, may more accurately be viewed as commentary on the evidence already before the jury (and hence permissible).

■ But Bartall urges that the second comment must be construed as a violation of "the fundamental rule, known to every lawyer, that argument is limited to the facts in evidence." *Shaw*, at 1281. Such a characterization would require the jury to have understood Goggin as saying his position gave him access to prejudicial facts, beyond those in evidence, that undermined Kerstein's testimony and therefore reinforced Bartall's guilt. Were that true, Goggin's statement would be akin to the one that prompted *Shaw*'s affirmance of the granting of a writ of habeas corpus.

*Shaw* had been a close case on the merits, and the prosecutor had said in closing argument (at 1281):

> Finally they would have you be misled by the police report in this case. You're not going to get those police reports. They're hearsay evidence. You can't have them. If you had them, you would see the truth.

Our Court of Appeals found "grossly improper and wholly avoidable" (at 1282) the prosecutor's blatant insinuation that he knew prejudicial facts unavailable to the jury. Because the jury had dealt with such a close case, the court determined there was a substantial likelihood the comment changed the result of the trial.

But this opinion has already found Bartall's case was *not* a close one, as was *Shaw*. At least equally significant, the two prosecutorial comments are very different indeed. In *Shaw* the prosecutor unquestionably told the jury he had personal knowledge of facts beyond the record that clearly determined defendant's guilt. Here Goggin's self-description—"when you are the prosecutor and you know all the facts of the case"—cannot fairly (at least without a real stretching of the language) be perceived in the same terms. There is no reason for the jury to have believed "all the facts of the case" meant anything other than the very facts that were before the jury itself for decision. Goggin referred to only one kind of evidence ("the photographs"), and those were obviously the photographs of Bartall's car windows admitted in evidence. Accordingly the reasonable jury would have understood Goggin as commenting only on the evidence it was to evaluate for itself. If that were improper at all, it does not in any case (unlike *Shaw*) pose serious due process problems.

### (c) *References to Quinn's family and jurors' relatives*

Goggin's rebuttal contained several improper and inflammatory references to Quinn's family. All were patently designed to "warp the factfinding function of the jury by deflecting its attention away from consideration of the evidence presented at trial" (*Crist*, 745 F.2d at 482):

> She has brothers and sisters and a mom and dad. They don't have Betty anymore. They don't talk to Betty anymore. They buried her in the ground last year because he killed her (R. 549).

> \*    \*    \*    \*    \*    \*

> Let's talk about this girl's [Quinn's] rights. To say good night to your Grandma "Good night, I'm going, be back. Can I borrow your car? Can I go back to school in a couple of days? Can I say goodbye to my brothers and sisters?" Does she have any more rights? (R. 556)

> \*    \*    \*    \*    \*    \*

> You decide, ladies and gentlemen, what's it all about, you take the law, you take the evidence, you say if somebody shoots this thing it's a reckless act at four peo-

ple, *and then you tell the Quinns what you decided* (R. 557) (emphasis added). Judge O'Malley denied Bartall's motion for mistrial based on the last statement.

Goggin's rebuttal also included an in- flammatory argument intended to stimu- late the jurors' own fears:

> For you now to come in here and buy some cocking [sic] bull story about a ricochet, some story about an accident, some story about the gun being up like that belies common sense, it belies com- mon sense and it says to the People of the State of Illinois, well, someone else put another one over on a jury. Let's give him another shot, give him another shot. Maybe he'll blow Preze away, maybe he'll blow one of your relatives away next (R. 556).

When defense counsel objected to the last comment, Judge O'Malley ordered the pros- ecutor to "decease [sic] and desist from any such inferences or remarks."

As the quoted remarks indicate, the tone of Goggin's closing argument was out- rageously unprofessional—and, more to the current point, prejudicial. Goggin's mis- conduct was not cured by Judge O'Malley, largely because defense counsel failed to object to all but the last-quoted remark.[3] And the prejudicial effect of Goggin's statements was intensified by their place- ment in rebuttal—in final closing argu- ment—thus ensuring they would be fresh in the jury's mind as deliberations began.

*Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974) defines the yardstick for mea- suring such misconduct by state prosecu- tors. This Court has applied that yardstick more strictly than our Court of Appeals has found appropriate: It granted habeas relief in *Crist*, 577 F.Supp. 504 (N.D.Ill. 1983), because it considered Crist was enti- tled to a trial untainted by the prosecutor's serious improprieties. Our Court of Ap-

peals disagreed, 745 F.2d 482–84, both be- cause it focused more heavily on Crist's patent guilt and because it considered most of the improprieties had been waived by defense counsel's failure to object.[4]

*Shaw* reached a different result from *Crist*, but it does not bespeak a change in doctrine. *Shaw* was an exceptional case because it was so close and because the prosecutor's reference to his personal knowledge of defendant's guilt so directly distorted the jury process and deprived the defendant of his specific Sixth Amendment right to confrontation. In this case Gog- gin's misconduct was not as damaging as that in *Shaw* and not materially different in seriousness from that in *Crist*.

As in *Crist*, the evidence of Bartall's guilt was so convincing it cannot be said there is a substantial likelihood the prose- cutor's misconduct changed the jury's ver- dict. *Crist* not *Shaw* controls here, and the remedy for Goggin's improprieties is not a new trial for Bartall but possible discipline for Goggin (see *Crist*, 745 F.2d at 482).

### 3. Other Alleged Errors

Bartall asserts other claimed errors, in- cluding allegedly prejudicial comments by Judge O'Malley and the admission of what Bartall considers overly prejudicial photo- graphic and testimonial evidence of Quinn's wounds. But Judge O'Malley's comments exhibit none of the asserted bias, and much of the evidence of Quinn's wounds, al- though perhaps arguably excludable, was merely cumulative of the medical examin- er's justifiably detailed and graphic testi- mony. Neither any of those matters nor any of the other claimed errors advanced by Bartall raises a significant due process concern.

### Conclusion

There is no genuine issue of material fact, and no evidentiary hearing is re-

---

**3.** See Appendix as to the State's claim of waiver on that score.

**4.** As this Court had pointed out (577 F.Supp. at 513), Illinois Supreme Court doctrine calls for

the review of unobjected-to prosecutorial impro- prieties under the circumstances presented by *Crist*. Indeed precisely that was done by the Supreme Court in this very case (see Appendix).

quired. Rule 8(a) following Section 2254. Prosecutorial misconduct and the other matters discussed in this opinion did not deprive Bartall of a fair trial in violation of his Fourteenth Amendment due process rights. Because it is unlikely the errors changed the jury's verdict, Bartall's petition for a writ of habeas corpus is denied. This action is dismissed with prejudice.

APPENDIX

 As another string to its bow on the prosecutorial misconduct issue, the State invokes *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982) to contend Bartall waived most of his objections in that area by failing to present contemporaneous objections at trial. But the cause-and-prejudice test in *Engle* (or perhaps more accurately *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)) does not apply where, as here, the state appellate court overlooks the waiver and addresses the merits of the claim. *Crist,* 745 F.2d at 482; *United States ex rel. Williams v. Franzen,* 687 F.2d 944, 951 (7th Cir.1982).

In reply the State argues the Illinois Supreme Court did not overlook the waiver here but instead ruled against Bartall on both procedural and substantive grounds. Where a state court relies on such twin grounds, the claim may be barred on habeas corpus review. *Farmer v. Prast,* 721 F.2d 602, 605 (7th Cir.1983).

But the short answer is that the Supreme Court did not rule against Bartall on procedural grounds. After pointing out that Bartall failed to raise a contemporaneous objection to most of the prosecutor's improper comments, the Court stated (98 Ill.2d at 321, 74 Ill.Dec. at 570, 456 N.E.2d at 72) (citations omitted):

> Even when no objection is made, however, inflammatory rhetoric warrants reversal when it prevents the defendant from receiving a fair trial or causes substantial interference with the fundamental integrity of the judicial process.

Thus the Supreme Court considered itself bound to examine the merits. It did so, rendering *Farmer* inapplicable here. This opinion has perforce dealt with the same "inflammatory rhetoric."